**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUDREY EASAW, | |
| Plaintiff, | Civil Action No. 17-00028 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DEBBIE NEWPORT, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The plaintiff, Audrey Easaw, a former employee of the American Association of Retired

Persons ("AARP"), brings this action against defendants Debbie Newport and Calade Partners,

LLC (collectively, the "defendants"), alleging a violation of the District of Columbia Human

Rights Act ("DCHRA"), D.C. Code §§ 2-1401 *et seq*., as well as tortious interference with

employment. Compl. ¶¶ 4, 28–32, 33–36, ECF No. 1-1.[1] After Ms. Newport's company, Calade

Partners, was hired in 2015 by AARP to provide consulting services, the plaintiff's job

description was re-written and the plaintiff's employment with AARP was terminated, effective

July 8, 2016. *Id.* ¶¶ 5, 10, 22-25. The plaintiff alleges that defendants were responsible for her

termination and discriminated against her on the basis of her race. Pending before the Court is

the defendants' motion to dismiss the complaint for failure to state a claim upon which relief

may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* Defs.' Mot.

---

[1] This action was removed from the Superior Court of the District of Columbia, pursuant to 28 U.S.C. §§ 1441, *et seq.* and 1332. *See generally* Def's Notice of Removal, ECF No. 1. Since the plaintiff is a resident of the District of Columbia, defendant Ms. Newport is a resident of the State of Tennessee, and defendant Calade Partners is a limited liability company organized under the laws of Tennessee with its principal place of business in Tennessee, Def's Notice of Removal ¶ 5, and the amount in controversy is $5,000,000, *id* ¶ 2, , this Court has diversity jurisdiction, under 28 U.S.C. § 1332.

Dismiss, ECF No. 5. For the reasons set forth below, the defendants' motion is granted in part and denied in part.

## I.     BACKGROUND

The plaintiff, an African-American female, started her employment with AARP in 2011 as a Corporate Engagement Management Director. *Id.* ¶ 6. For most of her time at AARP, the plaintiff reported to Ed O'Day, a Senior Vice President in Membership and Integrated Value. *Id.* In 2015, AARP retained defendants Ms. Newport, who is the co-founder and partner of Calade Partners, to provide consulting services. *Id.* ¶¶ 5, 10. At some point, the plaintiff's primary responsibilities were shifted to another director, a Caucasian male, who worked closely with a "new EVP Martha Boudreau." *Id.* ¶ 13. In August 2015, the plaintiff began working to start up "the AARP Experience," a new department within AARP. *Id.* That same month, the plaintiff began working with defendant Ms. Newport, who was "brought in to help 'stand up' the AARP Experience." *Id.* ¶ 14.

According to the complaint, shortly after they began working together, Ms. Newport "developed a habit of speaking to [plaintiff] in an abrasive and disrespectful tone." *Id.* ¶ 15. Nonetheless, the plaintiff was able to have a "very professional conversation with Ms. Newport about her 'tone'" and explained her concerns about Ms. Newport's management approach "and that she should speak to [plaintiff] in a respectful manner." *Id.* Ms. Newport responded by saying "I get it." *Id.* The plaintiff alleges that, at some unspecified time, she "raised concerns about Ms. Newport's approach as a consultant to Mr. O'Day," then an interim SVP for AARP Experience, who indicated that Ms. Boudreau had "given complete authority" to Ms. Newport "for oversight of standing up the AARP experience." *Id.*

In or around October 2015, the plaintiff expressed interest in one of the employment opportunities within AARP Experience, particularly Vice President for "Governance and Strategy," *id.* ¶ 16, although no indication is given whether the plaintiff actually applied for this position. Around the same time, Ms. Newport recommended Jim Pendergast for another position of Senior Vice President for AARP Experience, and he was subsequently hired and started his employment with AARP on March 28, 2016. *Id.* ¶ 17. In January 2016, Mr. O'Day announced that Michelle Musgrove, an African-American female, had been hired to serve as Vice President for Governance and Strategy of AARP Experience, "since she had been doing the work," *id.* ¶¶ 14, 19, the same position in which the plaintiff had expressed interest.

From January through March 2016, the plaintiff "noticed delayed or no responses to emails/requests sent to" Ms. Newport and Ms. Musgrove, as well as "her exclusion from meetings." *Id.* ¶ 20. In mid-March 2016, Mr. O'Day informed the plaintiff that AARP was re-writing the job description for her position as AARP Experience Management Director, and "if she was not already doing 70% of the work in the job description, she would be displaced." *Id.* ¶ 22. "To [the plaintiff's] knowledge, no other full-time employee within the AARP Experience had their position description rewritten." *Id.*

In mid-March 2016, Mr. O'Day sent the plaintiff a draft of the new job description. *Id.* ¶ 23. After reviewing the job description, the plaintiff informed Mr. O'Day that she believed she was doing at least 70% of the work outlined in the description. *Id.* Mr. O'Day told the plaintiff that the job description was not finalized and that he was taking an interim position in a different department at AARP, but would "stay in touch throughout 'the process.'" *Id.* He advised the plaintiff to speak to Mr. Pendergast "as soon as possible." *Id.*

The plaintiff alleges that she had "initial discussions with Mr. Pendergast which led her to believe that she was still being considered as a viable member of the team." *Id.* ¶ 24. According to the complaint, however, Mr. Pendergast then spoke to defendant Ms. Newport about the plaintiff and, "as a result, a decision was made that [the plaintiff] would not continue employment with AARP." *Id.* On May 16, 2016, the plaintiff was informed by Mr. O'Day that her employment was being terminated with an effective date of July 8, 2016. *Id.* ¶ 25.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," but "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" are needed for "'grounds'" of "'entitle[ment] to relief,'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957)), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id.*

at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construe all reasonable inferences in favor of the plaintiff.  *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor."  (citing *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014))).  The Court "need not, however, 'accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'"  *Nurriddin*, 818 F.3d at 756 (alteration in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

### B. Motions to Dismiss Employment Discrimination Claims Generally

The Supreme Court has instructed that "the precise requirements of a *prima facie* case can vary depending on the context" and "should not be transposed into a rigid pleading standard for discrimination cases."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  In view of this "emphasis on flexibility," the D.C. Circuit has adopted, for claims asserted under various anti-discrimination statutes, a "general version of the *prima facie* case requirement: 'the plaintiff must establish that (1) she [or he] is a member of a protected class; (2) she [or he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *see also Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *George v. Leavitt,* 407 F.3d 405, 412 (D.C. Cir. 2005); *Krodel v. Young*,

748 F.2d 701, 705 (D.C. Cir. 1984) ("an individual plaintiff claiming disparate treatment must first make out a *prima facie* case -- *i.e.*, must demonstrate sufficient facts to create a reasonable inference that race, sex or age was a factor in the employment decision at issue.").  The burden of showing a *prima facie* case at the pleading stage "is not onerous."  *Id.*; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Absent direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green* ("*McDonnell Douglas*"), 411 U.S. 792, 792-93 (1973), which generally applies at summary judgment, *see, e.g.*, *id.* (applying framework to Title VII claim); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying framework to an ADEA claim); *Krodel v. Young,* 748 F.2d at 705 (same).  Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if he does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination.  *McDonnell Douglas,* 411 U.S. at 802-05; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

At the motion to dismiss stage, however, an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss.  *See Swierkiewicz*, 534 U.S. at 511, 515 (holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a *prima facie* case because the *McDonnell Douglas* framework does not apply in every employment discrimination case" and "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits"); *see also*

*Twombly*, 550 U.S. at 569-70, 586 ("it should go without saying in the wake of *Swierkiewicz* that

a heightened production burden at the summary judgment stage does not translate into a

heightened pleading burden at the complaint stage"); *Gordon v. U.S. Capitol Police*, 778 F.3d

158, 161-162 (D.C. Cir. 2015) (noting that a plaintiff "need not plead facts showing each of the[]

elements [for a discrimination claim] in order to defeat a motion under Rule 12(b)(6)," relying on

*Swierkiewicz,* where "the [Supreme] Court rejected such a pleading requirement for

discrimination claims," and, in *Twombly,* "actually reaffirmed" *Swierkiewicz*); *Jones v. Air Line

Pilots Ass'n, Intern*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (noting that in discrimination suit, a

"plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a

motion to dismiss." (citing *Swierkiewicz*)). While the D.C. Circuit has "been clear [] that '[a]t the

motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did

not plead the elements of a *prima facie* case,'" *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C.

Cir. 2014) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008)), the

plaintiff must still allege sufficient facts "to draw the reasonable inference that the defendant is

liable for the misconduct alleged," *id.* (quoting *Iqbal*, 556 U.S. at 678) (reversing dismissal of

discrimination claim, under 42 U.S.C. § 1983, where complaint "sufficiently makes out" an

inference of race and gender discrimination by alleging that plaintiff, a black female, was denied

tenure while a white male employee won tenure when both "had similar records with regard to

teaching and service…[and] both also failed to meet the publication requirement").

## III.    DISCUSSION

Although the plaintiff was employed by AARP, the plaintiff has not sued AARP and only

brings claims against AARP's consultants, defendants Ms. Newport and Calade Partners.  In

Count One, the plaintiff alleges that the defendants discriminated against her on account of her

race in violation of the DCHRA. Compl. ¶¶ 28–32, and, in Count Two, she contends that the defendants committed tortious interference with her employment at AARP, *id.* ¶¶ 33–36. Each count is addressed in turn.

## A. Count One: DCHRA

The defendants move to dismiss Count I for failure to state a claim, arguing that they cannot be held liable under the DCHRA because they were not the plaintiff's "employer" and, in any event, that the plaintiff has failed to state a claim for unlawful discrimination.[2] Even if the defendants qualified as the plaintiff's "employer" under the DCHRA, the plaintiff's claim

---

[2] The parties vigorously dispute whether defendants may be considered the plaintiff's "employer" for the purposes of the DCHRA. "Only an employer may be held liable for violations of . . . the DCHRA," *Jolevare v. Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 7 (D.D.C. 2007) (quoting *Zuurbier v. MedStar Health, Inc.,* 306 F. Supp. 2d 1, 6 (D.D.C. 2004) (citing D.C. Code § 2–1402.11(a)(1))), but the DCHRA broadly defines "employer" as "any person who, for compensation, employs an individual . . . [and] any person acting in the interest of such employer, directly or indirectly . . . ." D.C. Code § 2–1401.02. Further, "[a]n individual may be classified as an employer for purposes of the DCHRA if, for example, he is a manager who 'acted in the interest of [the] employer,' who either 'perpetrated' or 'witnessed and failed to stop' alleged discriminatory acts, 'or to whom [the employee] complained without success about, the [alleged] discriminatory acts.'" *Poola v. Howard Univ.,* 147 A.3d 267, 281 (D.C. 2016) (quoting *Smith*, 598 F. Supp. 2d at 48–49); *Purcell v. Thomas*, 928 A.2d 699, 715 (D.C. 2007) (quoting *Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213, 241 (D.D.C. 2005) (explaining that the "text and purpose of the DCHRA," as well as case law, do not "preclude a claim against individual and supervisory employees involved in committing the allegedly discriminatory conduct"); *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 888 (D.C. 1998) (holding the DCHRA applied to individual partners of a law firm because the partners acted in the interest of the employer, a law partnership); *see also King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 331–32 (D.D.C. 2011) ("Courts have held individuals liable under the DCHRA when they were personally involved in the discriminatory conduct . . . or when they aided or abetted in the discriminatory conduct of others."); *Zelaya v. UNICCO Serv. Co.,* 587 F. Supp. 2d 277, 284–85 (D.D.C. 2008) (concluding that plaintiff's supervisor could be held individually liable under the DCHRA); *MacIntosh v. Bldg. Owners and Managers Ass'n Int'l.* 355 F. Supp. 2d 223, 227–28 (D.D.C. 2005) (denying a motion to dismiss a DCHRA claim against an association's Executive Director and Vice President, relying on *Wallace*); *Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213, 241 (D.D.C. 2005) (declining to preclude a DCHRA claim against "individual management and supervisory employees involved in committing the allegedly discriminatory conduct"). Given the breadth of the DCHRA's definition of "employer," the plaintiff argues that Ms. Newport and Calade meet the standard for an employer under the DCHRA, arguing that the defendants acted "in the interest of [the AARP], directly or indirectly," and alleging that Martha Boudreau, the AARP's EVP, "deferred completely to Ms. Newport's recommendations and decisions on the customer experience strategy, including decisions on which employees at AARP should be retained and terminated at AARP." Compl. ¶ 10. The defendants, in contrast, shift the focus to the DCHRA definition of "employee," contending that "[b]ecause she is not an employee of Ms. Newport or Calade, Ms. Easaw cannot state a claim against Ms. Newport or Calade for a violation of the DCHRA." *See* Defs.' Reply Supp Mot. Dismiss ("Defs.' Reply") at 2–3, ECF No. 9. The issue of whether defendants were the plaintiff's employers need not be reached because the plaintiff's DCHRA claim is dismissed on an alternative ground.

nonetheless fails because she has not pleaded sufficient facts to support an inference of discrimination.

To make out a *prima facie* case of disparate treatment under the DCHRA, a plaintiff must show that "(1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination, that is, an inference that her employer took the action because of her membership in a protected class." *Abebio v. G4S Gov't Sols., Inc.*, 72 F. Supp. 3d 254, 257 (D.D.C. 2014) (quoting *Miles v. Univ. of D.C.,* Civil No. 12–378 (RBW), 2013 WL 5817657, at *13 (D.D.C. Oct. 30, 2013) (quoting *Brown v. District of Columbia,* 919 F.Supp.2d 105, 115 (D.D.C. 2013))). Defendants do not dispute that the plaintiff is a member of a protected class or that, by being terminated, the plaintiff suffered an adverse employment action.[3] Instead, the only dispute is whether the plaintiff has alleged sufficient facts giving rise to an inference of discrimination.

---

[3]     The plaintiff suggests that, in addition to her termination, she was subjected to other alleged adverse employment actions by Ms. Newport, *see* Compl. ¶ 31, but none of these are the kinds of "ultimate employment decisions" that typically constitute an "adverse employment action" for the purposes of the DCHRA, *Taylor v. FDIC,* 132 F.3d 753, 764 (D.C. Cir. 1997) ("[C]ourts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting, and compensating . . . [and not] interlocutory or intermediate decisions having no immediate effect upon employment decisions."), as they did not result in a "significant change in employment status," *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). *See, e.g., Howard v. Office of Chief Admin. Officer of United States House of Representatives*, Civil No. 09-1750, 2015 WL 12839770, at *7 (D.D.C. Aug. 4, 2015) (holding that a "slight change in responsibilities alone does not constitute an adverse employment action"); *Casey v. Mabus,* 878 F. Supp. 2d 175, 184 (D.D.C. 2012) (exclusion from meetings not adverse employment action where plaintiff did not "allege any specific meetings from which she was excluded and, more importantly, [ ] failed to articulate any objectively tangible harm she suffered by being excluded" (citing *Hayslett v. Perry,* 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (no adverse employment action where plaintiff did not specify meetings or demonstrate how exclusion from meetings caused her harm)); *King v. Georgetown University Hospital,* 9 F.Supp.2d 4, 6 (D.D.C. 1998) (granting summary judgment to employer on DCHRA discrimination claim where employee failed to show a change in job responsibilities changed her salary, benefits, or job grade); *Hunter v. Ark Restaurants Corp.,* 3 F. Supp. 2d 9, 20 (D.D.C. 1998) (granting summary judgment to employer on DCHRA retaliation claim because the fact that a supervisor "scolded [the plaintiff] for complaining" and "filed disciplinary write-ups against him" did not have "demonstrably adverse consequence[s]"). Further, even if the acts complained of are considered "adverse employment actions," they all share the same fatal defect: no factual allegations in the complaint give rise to a plausible inference of discrimination, *i.e.* that the defendants took the actions because of the plaintiff's race.

The plaintiff argues that she is "not required to show facts establishing a *prima facie* case to survive a motion to dismiss," relying on *Swierkiewicz*, 534 U.S. at 510, *see* Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n") at 9, ECF No. 8, and that "[t]o establish causation surviving a motion to dismiss, 'all a complaint needs to state is: I was turned down for a job because of my race,'" *id.* at 12 (quoting *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000))).[4] Nonetheless, the

---

[4]　While the plaintiff is correct that, in *Swierkiewicz*, the Supreme Court held that an employment discrimination complaint arising under Title VII "need not plead a prima facie case of discrimination," 534 U.S. at 515, a holding expressly endorsed by the Supreme Court in *Twombly,* 550 U.S. at 547, the scope of this holding does not eliminate the fundamental requirement that sufficient notice be provided to demonstrate a plausible cause of action for discrimination. Indeed, the *Swierkiewicz* Court explained that it "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss," 510 U.S. at 511, since the *McDonnell Douglas* framework "is an evidentiary standard, not a pleading requirement," *id.* at 510, and "does not apply in every employment discrimination case," *id.* at 511. Thus, *Swierkiewicz* does not stand for the proposition that a complaint can survive a motion to dismiss when it consists only of conclusory allegations and is devoid of facts from which a plausible inference can be drawn that discrimination played a role in an adverse employment action. *See Swierkiewicz*, 534 U.S. at 508 n.1 ("Because we review here a decision granting respondent's motion to dismiss, we must accept as true all of the *factual* allegations contained in the complaint." (emphasis added)); *id.* at 514 ("These allegations give respondent fair notice of what [the plaintiff's] claims are and *the grounds upon which they rest*." (emphasis added)). The factual allegations at issue in *Swierkiewicz* bear this out: the plaintiff alleged ample facts supporting an inference of discrimination. The plaintiff, a 53-year-old native of Hungary, worked for six years in the position of senior vice president and chief underwriting officer ("CUO") for a reinsurance company, until the company's French Chief Executive Officer demoted the plaintiff and transferred most of his responsibilities to a new 32-year-old French national employee. *Swierkiewicz*, 534 U.S. at 508. The plaintiff was able to plead that the new employee was "less experienced and less qualified to be CUO than he, since at that point he had 26 years of experience in the insurance industry," compared to the new employee's one year. *Id.* Thus, in *Swierkiewicz*, the plaintiff alleged multiple facts from which a plausible inference could be drawn that age and national origin discrimination was present. As the *Twombly* court explained, it was "not requiring heightened fact pleading of specifics, but *only enough facts to state a claim to relief that is plausible on its face*." *Twombly*, 550 U.S. at 547 (emphasis added). While the plaintiff need not establish a *prima facie* case under the *McDonnell Douglas* framework, the plaintiff must still allege enough facts, "taken as true, [which] render h[er] claim of [discrimination] plausible." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

Additionally, while the current pleading standard is not "onerous," *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) (citation omitted), to the extent the plaintiff seeks to rely on *Sparrow* for the proposition that all a complaint needs to state is "I was turned down for a job because of my race," the undersigned joins the chorus of Judges of this Court who have held that *Sparrow* is no longer binding authority after *Twombly* and *Iqbal*. *See, e.g.*, *McManus v. Kelly*, Civil No. 14-1977 (RDM), 2017 WL 1208395, at *5 (D.D.C. Mar. 31, 2017) ("[A]lthough the issue is not entirely settled, the Court is convinced that the *Sparrow* pleading standard is no longer controlling."); *Greer v. Bd. of Trs. of Univ. of D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (noting that "*Twombly* and *Iqbal* require more factual context" than the "multiple assumptions" necessary to state a claim under the *Sparrow* standard); *Jackson v. Acedo*, Civil No. 08–1941 (RBW), 2009 WL 2619446, at *4 (D.D.C. Aug. 26, 2009) (concluding that "*Sparrow* is no longer binding authority in light of" the Supreme Court's observations "in *Twombly*"). Stating simply "I was turned down for a job because of my race" is precisely the kind of conclusory allegation that is patently incompatible with *Twombly* and *Iqbal*'s pleading requirements.

plaintiff concedes that she must establish a "nexus between defendants' alleged discriminatory motive and the adverse action," Pl.'s Opp'n at 11 (citing *Poola*, 147 A.3d at 276), that she "must present evidence above the speculative level," *id.* (citing *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014), that she "should make sufficient factual allegations to "nudge[] [her] claims across the line from conceivable to plausible," *id.* (quoting *Twombly*, 550 U.S. at 570), and that her "allegations must go beyond 'an unadorned, the-defendant-unlawfully-harmed-me accusation," *id.* (quoting *Iqbal*, 129 S. Ct. at 1949).

The plaintiff cannot meet her own standard. Even accepting all "well-pleaded factual allegations" set forth in the complaint as true, *Iqbal,* 556 U.S. at 679, and granting all reasonable inferences in the plaintiff's favor, no facts alleged in the plaintiff's complaint support anything "more than a sheer possibility that [the] defendant has acted unlawfully," *id.* at 678. The plaintiff intimates AARP or its officers made at least two decisions based on considerations of race. First, the plaintiff notes that she was unable to schedule an interview for a position in the AARP Foundation, alleging that the hiring manager "did not want to interview" the plaintiff because she "had someone else in mind for the job: a white male with less experience." Compl. ¶ 12. Second, after the plaintiff began working to help "stand up" the AARP Experience, the plaintiff claims another director, a Caucasian male, began working closely with Ms. Boudreau and was subsequently promoted to Vice President. *Id.* ¶ 13. Neither of these decisions, however, are adverse employment actions about which the plaintiff complains, *see id.* ¶ 31, nor does the plaintiff indicate how the named defendants were involved in either decision. In short, the plaintiff has simply not alleged facts that would even remotely give rise to an inference of discrimination by the defendants she has named.

The plaintiff's *strongest* evidence against the defendants is that shortly after she began working with Ms. Newport, Ms. Newport spoke to her in an "abrasive and disrespectful tone." Compl. ¶ 15. The plaintiff, however, does not allege that this "tone" had anything to do with the plaintiff's race nor does she allege that Ms. Newport made any discriminatory remarks. Instead, the plaintiff states that she was actually able to have a "very professional conversation with Ms. Newport about her 'tone' when addressing" the plaintiff, and that Ms. Newport acknowledged this by saying "I get it." *Id.* Nowhere in the complaint does the plaintiff allege that Ms. Newport continued to speak to her in an "abrasive and disrespectful tone" after this conversation. That the plaintiff was able to have a "very professional conversation" with Ms. Newport, who then presumably modified her tone, undermines the plausibility of an inference that Ms. Newport's verbal interactions with the plaintiff were motivated by discriminatory animus. While the plaintiff "noticed a gradual 'coolness' towards her" from Ms. Newport, *id.,* a "chilly" relationship does not imply a discriminatory one.

Likewise, while the plaintiff complains about "delayed" responses to emails and "her exclusion from meetings," *id.* ¶ 20, which she blames on the defendants, she also indicates that Ms. Musgrove subjected her to the same treatment during the same period of time, *id.* Moreover, nothing about these factual allegations supports an inference of discrimination.[5] The DCHRA is

---

[5] In her opposition, the plaintiff claims defendants have "mischaracterize[d] [her] adverse employment action claims." Pl.'s Opp'n at 14. The plaintiff contends that the conversation the plaintiff had with Ms. Newport was "protected activity," and after this conversation, "Ms. Newport retaliated against [the plaintiff] by excluding her from AARP meetings." *Id.* There are at least three fatal problems with this argument. First, the plaintiff never alleges a claim of retaliation in her complaint nor does she allege any facts giving rise to an inference that any exclusion from meetings was in "retaliation" for the conversation about Ms. Newport's tone. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."). Second, the plaintiff points to no authority—and the Court has found none—that supports the proposition that her conversation with Ms. Newport was statutorily "protected activity" under the DCHRA, especially since the plaintiff does not allege she raised any issues regarding racial discrimination. *See McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 154 (D.D.C. 2014) (concluding that "protected activity" under the DCHRA includes protections for "employees who bring or threaten to bring a discrimination claim against their employer"); *see* D.C. Code §§ 2-1402.61, 32-507. Finally, although the

not a "'general civility code' that permit[s] recovery for 'ordinary tribulations of the workplace.'" *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 120 (D.D.C. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The Complaint appears to "invoke[] a combination of a cat's paw theory and circumstantial evidence of racial discrimination," *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015), whereby the plaintiff attempts to impute Ms. Newport's alleged discriminatory animus to the ultimate decision-makers who terminated the plaintiff's employment. In order to prevail on such a theory, the plaintiff must show that "[1] a supervisor perform[ed] an act motivated by [discriminatory] animus, [2] that is intended by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action." *Id.* (quoting *Staub v. Proctor Hospital,* 562 U.S. 411, 422 (2011)). While the Complaint is unclear as to who at AARP made the ultimate decision to terminate the plaintiff's employment, the plaintiff claims "Ms. Newport requested and approved the rewriting of [the plaintiff's] job description," Compl. ¶ 22, and that "as a result" of a conversation between Ms. Newport and Mr. Pendergast, "a decision was made that [the plaintiff] would not continue employment with AARP," *id.* ¶ 24. The plaintiff's claim nonetheless "founders on the absence of evidence raising a reasonable inference that [Ms. Newport] was motivated even in part by racial discrimination," and thus the Court "need not separately analyze the causal factors." *Burley,* 801 F.3d at 297. As noted, the allegation that Ms. Newport spoke in an "abrasive and disrespectful tone" is insufficient to raise a reasonable inference that Ms. Newport's subsequent acts were motivated by considerations of race. Compl. ¶ 15. This insufficiency cannot be

---

plaintiff alleges that she "raised concerns about Ms. Newport's approach as a consultant" to Mr. O'Day, Compl. ¶ 15, the plaintiff does not allege that she mentioned her conversation with Ms. Newport or complained about her interaction with Ms. Newport, let alone raised any issues regarding racial discrimination. *See McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d at 154.

salvaged by the Complaint's conclusory allegation that defendants "engaged in unlawful discrimination against Plaintiff based on race," Compl. ¶ 31, as that is precisely the type of "formulaic recitation of the elements of a cause of action" that is inadequate to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

Finally, the plaintiff further undermines her case by alleging other facts that suggest race was not a factor in the termination decision. For example, the plaintiff explains that "senior management was being pressured to bring in employees from outside of AARP," *id.* ¶ 25, an entirely race-neutral rationale. Moreover, although the plaintiff desired the position of Vice President for Governance and Strategy of AARP Experience, *id.* ¶ 16, this position ultimately went to Ms. Musgrove, an African-American female, *id.* ¶¶ 14, 19. That an African-American woman was promoted does not necessarily preclude the plaintiff's race discrimination claim. Nonetheless, this fact significantly weakens a complaint that is already barren of factual allegations that could give rise to an inference that any of the adverse employment actions of which the plaintiff complains were based on considerations of race.

In sum, considering the complaint in its entirety, accepting all factual allegations in the complaint as true and construing all reasonable inferences in favor of the plaintiff, *see Twombly*, 550 U.S. at 555; *Nurriddin*, 818 F.3d at 756, the plaintiff's complaint simply does not contain sufficient factual allegations to "nudge" Count I "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Lacking facts that could give rise to an inference of a discrimination, Count I does not go beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Accordingly, the defendants' motion to dismiss Count I of the plaintiff's complaint is granted.

## B. Count Two: Tortious Interference

The plaintiff also alleges that defendants committed tortious interference with her employment with AARP. Compl. ¶¶ 33–36. Under D.C. law, a *prima facie* case of tortious interference with a contract or business relationship requires "(1) existence of a valid contractual or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages." *Whitt v. Am. Prop. Constr., P.C.*, Civil No. 15-1199, 2017 WL 1288572, at *3 (D.C. Apr. 6, 2017) (quoting *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038 (D.C. 2015) (quoting *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015))).[6] The plaintiff alleges that she "was offered and accepted the position of Corporate Engagement Management Director at AARP and therefore had an employment contract with AARP," Compl. ¶ 34, and that "Ms. Newport interfered with Ms. Easaw's employment by excluding her from AARP meetings; advocating for changes in Plaintiffs position; rewriting Plaintiffs job description and causing the termination of Ms. Easaw by AARP." *Id.* at ¶ 35. In moving to dismiss the second count for failure to state a claim, the defendants raise just one argument, asserting that "[w]here the alleged 'contract' at issue is an at-will employment relationship, a claim of intentional interference with contract is barred." Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 13, ECF No. 5-1 (citing *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 22 (D.D.C. 2002)). The defendants are incorrect.

---

[6] In the past, the D.C. COA treated "tortious interference with contract" and "tortious interference with prospective business advantage" as separate torts. *See, e.g.*, *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000). More recently, however, the D.C. COA appears to have recognized that "[t]he elements of tortious interference with prospective business advantage mirror those of interference with contract," *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 346 (D.C. 2015) (quoting *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003)), and has treated them as a single tort with the same series of elements. *See, e.g.*, *Whitt*, 2017 WL 1288572, at *3; *Newmyer*, 128 A.3d at 1038.

In support of their position, the defendants rely, in part, on *Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 774 F.3d 18 (D.C. Cir. 2014), in which the D.C. Circuit held that it is "reasonably clear . . . that the general rule in the District of Columbia is that an at-will employment agreement cannot form the basis of a claim of tortious interference with contractual relations." *Id.* at 23 (internal quotation marks and citation omitted). Although the Circuit recognized that the "*result*" of a prior D.C. Court of Appeals ("D.C. COA") decision is "inconsistent" with this rule, *id.* (emphasis in original) (citing *Sorrells v. Garfinckel's, et al.,* 565 A.2d 285 (D.C. 1989)), the D.C. Circuit explained that "no D.C. Case *holds* to the contrary," *id.* (emphasis in original). Just one year later, however, the D.C. COA did just that, holding that an at-will employee *could* sustain a tortious interference claim because an "at-will employment relationship of the kind" considered "is a valid and subsisting business relationship for the purposes of a tortious interference claim." *Newmyer*, 128 A.3d at 1040. Thus, a threshold inquiry is whether this Court is bound by the D.C. Circuit's interpretation of D.C. law or, alternatively, whether it must follow a subsequent and conflicting decision by the D.C. COA. This issue is addressed first before turning to the merits of the defendant's motion to dismiss.

## 1. Conflicts between D.C. Circuit *Erie* predictions and decisions by the D.C. COA

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the State," *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938), and thus, in a diversity case, such as this one, all federal courts have a duty "to ascertain and apply the state law" as "it controls decision," *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944). This rule applies no less to a court sitting in the District of Columbia.[7] *Novak v. Capital*

---

[7]     As the District of Columbia is not a "state," the rule of *Erie* is not "mandatory" here in the sense that it is required by the Rules of Decision Act, 28 U.S.C. § 1652, or the Constitution. *See, e.g.*, 28 U.S.C. § 1652 ("The law of the several *states* . . .shall be regarded as rules of decision in civil actions . . . ." (emphasis added)); *Lee,* 593 F.2d

*Mgmt. & Dev. Corp.,* 452 F.3d 902, 907 (D.C. Cir. 2006) (citing *Lee v. Flintkote Co.,* 593 F.2d 1275, 1279 n.14 (D.C. Cir. 1979)). "To properly discern the content of state law," courts "must defer to the most recent decisions of the state's highest court," *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010), and when interpreting and applying D.C. law, courts "fulfill this obligation by looking to the published opinions of the D.C. Court of Appeals" *Rogers v. Ingersoll–Rand Co.,* 144 F.3d 841, 843 (D.C. Cir. 1998); *see Smith v. Wash. Sheraton Corp.,* 135 F.3d 779, 782 (D.C. Cir. 1998) (stating that in "a diversity case, the substantive tort law of the District of Columbia controls"). At the same time, "[v]ertical stare decisis—both in letter and in spirit—is a critical aspect of our hierarchical Judiciary," *Winslow v. F.E.R.C.*, 587 F.3d 1133, 1135 (D.C. Cir. 2009), and it is self-evident that this Court is generally bound by the decisions of the D.C. Circuit, *see* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."). These two well-settled principles are not commonly in tension unless the D.C. COA issues a decision that contradicts the D.C. Circuit's prior interpretation of D.C. law. In such a circumstance, this Court must decide whether to follow D.C. Circuit precedent or, alternatively, defer to the more recent decision by the D.C. COA.

The D.C. Circuit has not squarely addressed the issue of what a district court should do when faced with conflicting authority on D.C. law by the D.C. Circuit and the D.C. COA. At

_____

at 1279 n.14 (noting that the constitutional underpinnings of *Erie* "have no force" with respect to the District of Columbia, as the District "has no reserved power to be guaranteed by the Tenth Amendment"). Nonetheless, the D.C. Circuit has instructed that when interpreting District of Columbia law, federal courts must look to the decisions of the D.C. COA to protect the "dual aims of *Erie* : discouraging forum shopping and promoting uniformity within any given jurisdiction on matters of local substantive law." *Id.; Novak,* 452 F.3d at 907; *see also Hinton v. Combined Sys., Inc.*, 105 F. Supp. 3d 16, 28 n.7 (D.D.C. 2015) ("[T]he D.C. Court of Appeals is the final arbiter of D.C. law[.]").

least two reasons, however, strongly support this Court's conclusion that when the D.C. COA has spoken clearly and unmistakably to the current state of D.C. law, its views must govern.

First, the "very essence of *Erie* is that . . . the bases of state law are as equally communicable to the appellate judges as they are to the district judge." *Salve Regina College v. Russell,* 499 U.S. 225, 238-8 (1991). Thus, in a diversity case, this Court must apply the current substantive law of the District of Columbia, *Rogers,* 144 F.3d at 843; *Smith,* 135 F.3d at 782, which the D.C. Circuit is no more qualified than this Court to ascertain.[8]

Second, applying an outdated and incorrect interpretation of D.C. law by the D.C. Circuit would "subvert the dual aims of *Erie*: discouraging forum shopping and promoting uniformity within any given jurisdiction on matters of local substantive law." *Lee*, 593 F.2d at 1279 n.14 (citing *Erie*, 304 U.S. at 74–77). These twin aims rest on a principle of fairness that the "character or result of a litigation" should not "differ because the suit had been brought in a federal court." *Walko Corp. v. Burger Chef Sys., Inc.*, 554 F.2d 1165, 1171 (D.C. Cir. 1977) (quoting *Hanna v. Plumer,* 380 U.S. 460, 467 (1965)). To this end, the D.C. Circuit has reasoned that because the D.C. COA is the "principal arbiter of District law," *Lee*, 593 F.2d at 1279 n.14 (citing 28 U.S.C. § 1257 ("The highest court of the District of Columbia is the District of Columbia Court of Appeals.")), "were [the D.C. Circuit] not to yield a measure of deference to the District of Columbia Court of Appeals, two courts neither of which could review the

---

[8] Indeed, the Supreme Court has suggested that district courts may actually be better positioned "to resolve complex questions as to the law of that state" than federal appellate judges, who may have "no such personal acquaintance with the law of the state." *Salve Regina Coll.*, 499 U.S. at 239 n.5 (quoting 19 C. WRIGHT, A. MILLER, & E. COOPER, *FEDERAL PRACTICE AND PROCEDURE* § 4507, pp. 106–110 (3d 1982)); *see also Harville v. Anchor-Wate Co.*, 663 F.2d 598, 602 (5th Cir. 1981) ("Only when the district court's view of applicable state law is 'against the more cogent reasoning of the best and most widespread authority' should this court reverse the judgment of the lower court."). This reasoning likely stems from the fact that most federal Circuit Courts of Appeals have jurisdictions covering several states and thus, by their very nature, are more removed from the law of any particular state than a district court, but this consideration has less force with respect to the D.C. Circuit and the District Court for the District of Columbia.

other's decisions would engage independently in the process of formulating the local law of the District," *id.* By following the most recent statement of D.C. law by the D.C. COA, this Court ensures that litigants in state and federal court are on equal footing. It would constitute an "inequitable administration" of the law, for example, if an action which would proceed in D.C. Superior Court would be dismissed "in federal court solely because of the [chance] that there is diversity of citizenship between the litigants." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 753 (1980) (quoting *Hanna*, 380 U.S. at 468).

For these reasons, when a decision by the D.C. COA clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit interpreting D.C. law, this Court should apply the D.C. COA's more recent expression of the law. *See, e.g.*, *Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 125-26, n.30 (D.C. Cir. 1986) (deferring to another circuit court's view of state law when there was no evidence that the court missed "clear signals emanating from the state courts" and noting that "[o]bviously, we will not blind ourselves to state court decisions handed down *after* the circuit court opinion in question"); *Wankier v. Crown Equipment Corp.* 353 F.3d 862, 966 (10th Cir. 2003) ("[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue."); *Owen v. United States,* 713 F.2d 1461 (9th Cir. 1983) (explaining that a Ninth Circuit decision is "only binding in the absence of any subsequent indication from the California courts that [its] interpretation was incorrect"); *Cromer v. Safeco Ins. Co. of Am.*, Civil No. 09-13716, 2010 WL 1494469, at *8 (E.D. Mich. Apr. 14, 2010) ("In actions under a federal court's diversity jurisdiction, '[w]hen a conflict exists between holdings of the Circuit and more recent determinations of state appellate courts, the interpretation of the Circuit is not binding on federal

district courts.'" (quoting *In re N.Y. Asbestos Litig.*, 847 F. Supp. 1086, 1111 (S.D.N.Y. 1994));

*Ridglea Estate Condo. Ass'n v. Lexington Ins. Co.*, 309 F. Supp. 2d 851, 855 (N.D. Tex. 2004),

*overruled on other grounds*, 398 F.3d 332 (5th Cir. 2005), *vacated and remanded*, 415 F.3d 474

(5th Cir. 2005) (reasoning that "if a panel of the Fifth Circuit has settled on the state law to be

applied in a diversity case, that precedent should be followed 'absent a subsequent state court

decision or statutory amendment that rendered the [the Fifth Circuit's] prior decision clearly

wrong'" (quoting *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)); *Westport

Insurance Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d 601 (E.D.

Tex. 2003) ("Instead of relying exclusively on older [Fifth] circuit opinions, . . . [the court]

look[ed] to recent trends in the jurisprudence of the Texas Supreme Court and Texas' lower

courts for guidance."); *Stubl v. T.A. Sys., Inc.,* 984 F. Supp. 1075, 1093 (E.D. Mich. 1997)

(where two decisions of the Michigan intermediate appellate court on issue of Michigan law

contradict a prior Sixth Circuit decision on same issue, "federal district court should adopt the

state court's interpretation"); *Singletary v. Se. Freight Lines, Inc.*, 833 F. Supp. 917, 917 (N.D.

Ga. 1993) ("Under classic *Erie* doctrine, in a diversity case, a federal court should follow the

latest appropriate state decision at whatever point in the federal proceedings it comes."); *In re E.

& S. Dists. Asbestos Litig.,* 772 F. Supp. 1380, 1391 (E. & S.D.N.Y. 1991), *rev'd on other

grounds, In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992) ("Where a

conflict exists between holdings of the Second Circuit and more recent determinations of state

appellate courts, this court will follow the outcome it believes the New York Court of Appeals

would reach, without giving binding authority to the Second Circuit's construction of the state

statute.  The federal Court of Appeals is in the same position as a lower state court vis-à-vis the

New York Court of Appeals in construing state substantive law under *Erie*."); *Hamilton v. Accu-*

*Tek*, 62 F. Supp. 2d 802, 847 (E.D.N.Y. 1999) (stating that "[i]t must be remembered that no federal court can speak to questions of state law with any certitude[,]" and that "for this reason . . . it has sometimes been suggested that in *Erie* matters the district courts need not follow as strictly as they would interpretations of federal law by federal courts of appeals[.]") (citations omitted).

Accordingly, the D.C. Circuit's decision in *Metz* is not dispositive, as the defendants urge, but rather this Court must examine the viability of the plaintiff's instant claim for tortious interference under the more recent D.C. COA decision in *Newmyer*.

### 2. Whether D.C. Law Permits Claims of Tortious Interference with At-Will Employment Against a Third Party

As noted, in *Newmyer*, the D.C. COA held that, at least in certain circumstances, D.C. law allows claims of tortious interference with at-will employment against a third party. Despite this holding, defendants still insist that the plaintiff's claim is foreclosed. Defs.' Reply at 8–9. In evaluating whether the plaintiff states a claim for tortious interference, the D.C. COA's four prior decisions related to the question of whether D.C. law permits these kinds of tortious interference claims are reviewed.

The D.C. COA first addressed the question of the viability of a tortious interference claim for at-will employment in *Sorrells v. Garfinckel's et. al.,* 565 A.2d 285 (D.C. 1989). As relevant here, in *Sorrells*, an at-will employee of a department store brought a claim for intentional interference with her contract of employment against her former supervisor and the vice president for personnel, who had fired the plaintiff at the supervisor's recommendation. *Id.* at 286.[9] The plaintiff presented evidence showing that the supervisor engaged in a number of

---

[9]     The plaintiff did not contest on appeal the trial court's grant of a directed verdict for the vice president. *Sorrells*, 565 A.2d at 286 & n.1.

injurious acts targeted at the plaintiff, including restricting her telephone use, when other salespersons were allowed unrestricted use of telephones, *id.* at 287; accusing the plaintiff of stealing another salesperson's customer; and removing a stool the plaintiff used to accommodate a medical problem. Ultimately, in the presence of the supervisor, the vice president fired the plaintiff after she refused to resign. *Id.* at 288. The plaintiff testified that she then overheard the supervisor say "I finally accomplished what I set out to do." *Id.* The case eventually went to a jury, which found that the supervisor had acted with "malice" and was liable for intentional interference with contract. *Id.* at 288, 290.

On appeal, the supervisor argued that she could not be held liable on the tortious interference with contract claim because, as the plaintiff's supervisor, she was an agent of the employer rather than a "third party" to the contractual relationship between the plaintiff and the employer and, consequently, "she could not tortiously interfere with that relationship." *Id.* at 289. The supervisor relied on *Press v. Howard University,* 540 A.2d 733, 736 (D.C. 1988), in which the D.C. COA held that officers of a University could not be held liable for tortious interference with contract because they were "acting as agents" of the University and the "University through their actions could not interfere with its own contract." The *Sorrells* court distinguished *Press* because there the defendants were "officers of the university, not just supervisory employees" and "more importantly, there was no allegation that they had acted maliciously." *Sorrells*, 565 A.2d at 290. "As officers acting within the scope of their official duties," the *Sorrells* court explained, the *Press* individual defendants "served as the alter ego of the university and had the power to bind the university." *Id.* By contrast, in *Sorrells*, the supervisor "was not an officer of Garfinckel's" and "did not have the power to fire" the plaintiff. *Id.* While the *Sorrells* court acknowledged that it made "sense to shield from liability officers

[of a corporation] who act without malice[] and within the scope of their authority, as in *Press*, the same cannot be said for a supervisor [], who was not authorized to terminate the contract between [the plaintiff] and Garfinckel's, and whom the jurors found to have acted with malice." *Id.*

The *Sorrells* court noted that the law affords to a supervisor a "qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers—those who have the power to hire and fire," but held that "this privilege is vitiated when the supervisor acts with malice for the purpose of causing another employee's contract to be terminated." *Id.* at 291. While employees "acting within the scope of their employment are identified with the [employer] so that they may *ordinarily* advise the [employer] to breach [its] own contract without themselves incurring liability in tort," *Sorrells* held that "'[t]he rule does not protect one who procures a discharge of the plaintiff for an improper or illegal purpose.'" *Id.* (quoting KEETON *et al.*, PROSSER & KEETON ON THE LAW OF TORTS § 129, at 990 (5th ed. 1984) (emphasis in original). The *Sorrells* court determined that "this principle means that a person who maliciously procures the discharge of another by their common employer is not shielded from liability by his or her status as a supervisory employee." *Id.* In other words, malicious conduct by a supervisor falls outside the scope of employment, rendering the supervisor's conduct sufficiently independent of any agency relationship with the employer and thereby warranting third-party treatment for purposes of a claim for tortious interference.

After *Sorrells,* the D.C. COA issued three separate decisions that declined to allow an at-will employee to bring tortious interference claims, and spawned some confusion about the limits on such claims. The D.C. COA next considered such a claim in *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards ("Bible Way")*, 680 A.2d 419

(D.C. 1996).  In *Bible Way*, the plaintiff was hired to serve as Financial Secretary of a church after working for many years as a part-time employee, but two years later, the church discontinued the position.  *Id.* at 424.  The D.C. COA affirmed the dismissal of the plaintiff's claims for, among other things, tortious interference with contract, because the plaintiff never alleged "that at any time there was a formal contract of employment or any agreement between" the church and the plaintiff, "fixing a period of time for her employment.  *Id.* at 432.  The court explained that in the District of Columbia, "where there is no clear expression of an intent to enter into a contract for a fixed period, we recognize a presumption that 'the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party.'"  *Id.* at 432–33 (quoting *Sullivan v. Heritage Foundation,* 399 A.2d 856, 860 (D.C. 1979)).  Although the plaintiff alleged that she intended to work until she was seventy and there was a "tacit agreement" that she would work for the church "as long as she desired," the D.C. COA concluded this was insufficient to rebut the at-will presumption.  *Id.* at 433.  "Accordingly," the D.C. COA held that "there was no basis for . . . a tortious interference with contract claim."  *Id.*

*Bible Way* was followed by *McManus v. MCI Communications Corporation*, 748 A.2d 949 (D.C. 2000).  In *McManus*, the plaintiff, an African-American woman, was terminated from her job as a secretary for MCI when her position was eliminated, prompting her to sue her employer and two of her supervisors for, *inter alia*, tortious interference with prospective advantage.  *Id.* at 952.  The D.C. COA affirmed the grant of summary judgment for the defendants, finding that, as an at-will employee, the plaintiff "did not have a contractual employment relationship she could use as the basis for a suit for tortious interference with a contractual relationship."  *Id.* at 957 (citing *Bible Way*, 680 A.2d at 432–33).  The D.C. COA

expressly declined to hold, however, that "an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship," *id.,* basing its dismissal of the plaintiff's claim of tortious interference against her employer and former supervisors on other grounds.[10]  *See Little v. D.C. Water & Sewer Auth.*, 91 A.3d 1020, 1030 (D.C. 2014) (observing that *McManus* court "left open the issue of whether an at-will employee may pursue" a claim for tortious interference with prospective advantage).  First, the D.C. COA held that the plaintiff could not proceed against her employer "because it is axiomatic that an employer cannot interfere with its own contract."  *McManus*, 748 A.2d at 958 (citing *Sorrells*, 565 A.2d at 290).  As for the plaintiff's claims against her former supervisors, the *McManus* court noted that the "law affords to a supervisor . . . a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers—those who have the power to hire and fire."  *Id* at 958. (quoting *Sorrells*, 565 A.2d at 290).  Accordingly, the *McManus* court held that the plaintiff "could survive a summary judgment motion on her claims against [the former supervisors] (if available) only if she produced facts that suggest that they 'procure[d] a discharge of the plaintiff for an improper or illegal purpose.'"  *Id.*.

Finally, in *Futrell v. Department of Labor Federal Credit Union*, 816 A.2d 793 (D.C. 2003), the plaintiff was a former employee of the Department of Labor Federal Credit Union ("DOLFCU").  After DOLFCU's bonding company terminated its bond coverage of the plaintiff, the plaintiff's employment was terminated since federal regulations require that federal credit unions only employ individuals who are bonded.  *Id.* at 801 (citing 12 C.F.R. §§ 713.1, 713.3

---

[10] The *Little* court acknowledged that *McManus* left open whether an at-will employee could pursue a tortious interference with prospective advantage claim.  Nonetheless, the *Little* court, too, declined to reach the issue, choosing instead to resolve the plaintiff's claim for tortious interference on other grounds, namely that that the plaintiff failed to present any evidence that anyone "took action that constituted interference with his employment relationship" with his employer and "caused his termination."  *Little*, 91 A.3d at 1030.

(2002)). Following her termination, the plaintiff brought suit against the President of DOLFCU's Board and the bonding company, claiming, among other things, tortious interference with her employment rights. *Id.* at 798. The D.C. COA upheld summary judgment for defendants on her tortious interference claim, concluding that the plaintiff was an at-will employee, *id.* at 806, and thus, that "no employment contract—express or implied—existed between Futrell and DOLFCU" and thus the plaintiff could not "establish a prima facie case of intentional interference with contractual relations," *id.* at 807–08.

These four decisions—*Sorrells, Bible Way, McManus,* and *Futrell*—were all considered by the D.C. Circuit in *Metz.* In *Metz*, the appellant asked the D.C. Circuit to certify a question to the D.C. COA of whether "District of Columbia law permits a claim of tortious interference with at-will employment against a third party to the at-will arrangement." 774 F.3d at 22. The D.C. Circuit declined, concluding that the "question upon which [the plaintiff] seeks certification is not genuinely uncertain." *Id.* (internal quotation marks and citation omitted). The *Metz* court recognized that in *Sorrells* the D.C. COA allowed a claim for tortious interference with an at-will agreement, but nonetheless reasoned that "the case did not address the question of whether the at-will nature of the agreement precluded the claim." *Metz*, 774 F.3d at 23. Instead, the *Metz* court explained that *Sorrells* held only that "although a party cannot interfere with its own contract, a supervisor who is not an officer of a plaintiff's employer is not a party to the plaintiff's employment contract and therefore can interfere with it." *Id.* In contrast, the D.C. Circuit noted that in *Futrell, McManus*, and *Bible Way*, the D.C. COA held that a plaintiff could not bring a claim for tortious interference with an at-will agreement because an at-will employee does not have an employment "contract" for the purposes of tortious interference with contractual relations. The *Metz* court then explained, however, that nothing it said "would

26

preclude the D.C. Court of Appeals from . . . changing its rule altogether." *Id.* at 24. For example, the D.C. Circuit noted that "[i]t might be argued . . . that until a contract terminable at will has been terminated, 'the contract is valid and subsisting, and the defendant may not improperly interfere with it.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. *g* (AM LAW. INST. 1979)).

In *Newmyer*, the D.C. COA appears to have taken the D.C. Circuit's hint. In *Newmyer*, a school counselor became romantically involved with the mother of a child at the school. *Newmyer*, 128 A.3d at 1027. The plaintiff, the child's father, responded by, among other things, filing a complaint in court against the counselor as well as "publiciz[ing]" the counselor's acts "widely through the news media, allegedly as a weapon to disrupt the private life and career prospects of the school counselor." *Id.* The plaintiff was successful as the school counselor's employment was ultimately terminated after the child's father provided the school with a number of sexually explicit emails that had been exchanged between the child's mother and the school counselor. *Id.* at 1031. In the litigation that followed, the school counselor raised a counterclaim for tortious interference with his contractual and business relationships, but the trial court entered summary judgment in favor of the plaintiff. The plaintiff sought to uphold the trial court's grant of summary judgment for the plaintiff on the grounds that the counselor's "at-will status preclud[ed] his claim of tortious interference." *Id.* at 1039. The D.C. COA "disagree[d]" and reversed the trial court's entry of summary judgment, finding, contrary to *Metz*, that *Sorrells* did in fact hold that "liability for tortious interference may lie where an actor interferes with an at-will employee's relationship with an employer." *Id.* (citing *Sorrells*, 565 A2d at 288, 291, 292). Critically, the D.C. COA then explained that the District of Columbia's "law of tortious interference with business or contractual relationship derives from the Restatement (Second) of

Torts" and that in comment *g* to Section 766, the Restatement provides that a contract that is

terminable at-will is "valid and subsisting" until terminated "and the defendant may not

improperly interfere with it." *Id.* at 1039–40 (quoting RESTATEMENT (SECOND) OF TORTS § 766

cmt. g (AM LAW. INST. 1979)).[11] As noted above, this was the very basis suggested by the *Metz*

court for the D.C. COA to permit such tortious interference claims.

In a footnote, the *Newmyer* court distinguishes *Bible Way, McManus*, and *Futrell*,

explaining that *Newmyer* fell "outside of the line of cases in which we have held that an at-will

---

[11]     Although it does not bear on the analysis, this result is consistent with the case law of other state jurisdictions. As early as 1915, the Supreme Court noted that "[t]he fact that . . . employment is at the will of the parties, respectively, does not make it one at the will of others." *Truax v. Raich*, 239 U.S. 33, 38 (1915). More recently, the Supreme Court recognized that the "protection against third-party interference with at-will employment relations is still afforded by state law today." *Haddle v. Garrison*, 525 U.S. 121, 127 (1998) (citing *Georgia Power Co.* v. *Busbin*, 242 Ga. 612, 613 (1978) (applying Georgia law and stating "even though a person's employment contract is at will, he has a valuable contract right which may not be unlawfully interfered with by a third person")); *see also* Keeton *et al.*, PROSSER AND KEETON ON TORTS § 129, at 995–96 (5th ed. 1984) ("[E]minent legal writers to the contrary notwithstanding, the overwhelming majority of the cases have held that interference with employment or other contracts terminable at will is actionable, since until it is terminated the contract is a subsisting relation, of value to the plaintiff, and presumably to continue in effect." (footnotes omitted)); *Hall v. Integon Life Ins. Co.*, 454 So. 2d 1338, 1344 (Ala. 1984) ("[I]t does not defeat the plaintiff's cause of action if it is determined that the plaintiff was an at will employee."); *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1154 (2004) ("[I]t is firmly established in California that intentionally interfering with an at-will contractual relation is actionable in tort."); *Trail v. Boys & Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 138 (Ind. 2006) (explaining that an at-will employee "may bring a claim for tortious interference provided that, in addition to demonstrating the standard elements of the tort, she is 'prepared to show that the defendant interferer acted intentionally and without a legitimate business purpose.'"); *Patterson v. Gen. Motors Corp.*, No. 251192, 2005 WL 1160605, at *4 (Mich. Ct. App. May 17, 2005) ("An at-will employee may maintain a tortious interference claim if the employee asserts that a third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." (internal quotation marks omitted)); *Levens v. Campbell*, 733 So. 2d 753, 760 (Miss. 1999) ("Following the law of the [other] jurisdictions, this Court concludes that a claim for tortious interference with at-will contracts of employment is viable in this state as well." (citing *Storm & Assocs., Ltd. v. Cuculich*, 298 Ill. App. 3d 1040 (1998); *Duggin v. Adams*, 234 Va. 221 (1987); *Fleischer v. Pinkerton's, Inc.*, Civil No. 05–96–00628 1998 WL 47782, at *5 (Tex. Ct. App. Feb. 9, 1998)); *Huff v. Swartz*, 258 Neb. 820, 826 (2000) ("[A]t-will employment status, in and of itself, does not preclude a claim for tortious interference"); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 688 (Tex. 1989) ("The court of appeals properly held that a cause of action exists for tortious interference with a contract of employment terminable at will." (citing RESTATEMENT (SECOND) OF TORTS § 766 cmt *g* (AM LAW. INST. 1979)); *Payne v. Rozendaal*, 147 Vt. 488, 496 (1986) ("Except for special justification, the law has long recognized liability against one who intentionally intrudes to disrupt an existing contract relation." even though "the contract is terminable at will or unenforceable against the promisor . . . ." (quoting *Mitchell v. Aldrich*, 122 Vt. 19, 22, 23 (1960)); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559 (2011) ("[W]hen a contract is *terminable at will*, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed '*improper* methods.'" (quoting *Duggin*, 234 Va. at 226–27 (1987) (emphasis in original))).

employee, barred from challenging termination of employment, is also barred from bringing a tortious interference claim—essentially attacking the same termination—against third parties affiliated with that employer." *Newmyer*, 128 A.3d at 1040 n.14. The defendants in this case seize on this footnote to argue that *Newmyer* did not overrule prior decisions that "under an at-will arrangement the prerequisite does not exist for the tort of interference with an employment relationship." Defs.' Reply at 8-9 (quoting *Dale v. Thompson*, 962 F. Supp. 181, 184 (D.D.C. 1997) (citing *Bible Way*, 680 A.2d at 432)). The defendants also emphasize the footnote's language regarding "affiliation" with an employer, arguing that *Newmyer* is distinguishable from this case because, whereas in *Newmyer* the plaintiff "was not affiliated with the employer in any manner," in this case, "Ms. Newport worked as a consultant to AARP and worked with [the plaintiff]." Defs.' Reply at 9. The defendant's position is mistaken for at least two reasons.

First, *Newmyer*'s more recent and unequivocal holding simply cannot be squared with any older absolute bar against claims for tortious interference with at-will employment relationships. To the extent *Futrell, McManus*, or *Bible Way* suggest that such an absolute bar exists, this Court "must apply the most recent statement of state law by the state's highest court," *Vitkus v. Beatrice Co.,* 127 F.3d 936, 941–42 (10th Cir. 1997), as it represents "the latest and most authoritative expression of state law," *Lamarque v. Massachusetts Indem. & Life Ins. Co.*, 794 F.2d 194, 196 (5th Cir. 1986); *see also Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.,* 392 F.2d 380, 384 (2d Cir. 1968); *cf. Smith v. F.W. Morse & Co.,* 76 F.3d 413, 429 (1st Cir. 1996) (following the more "recently decided" New Hampshire Supreme Court case that "speaks directly to the question," rather than an older opinion).

Second, nothing in *Newmyer* or any prior D.C. COA opinion suggests that the defendants' status as consultants for AARP protects them from liability for tortious

interference.[12]  In both *McManus* and *Sorrells*, the D.C. COA explained that D.C. law affords *supervisors* a "qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers—those who have the power to hire and fire."  *Sorrells*, 565 A.2d at 291; *McManus,* 748 A.2d at 958.  No decision, however, holds that this qualified privilege extends to consultants, nor have defendants even claimed that they are protected by this privilege.[13]

For the foregoing reasons, as recently clarified in *Newmyer,* D.C. law permits claims for tortious interference with an at-will employment relationship against third parties.  As the defendant's motion to dismiss Count II was entirely premised on this argument that such a claim could not be maintained, the motion is denied.

---

[12]     The irony of the defendants' argument in this respect is not lost on the Court.  For Count I, the defendants argue adamantly that Ms. Newport "had no supervisory authority over AARP employees, such as [the plaintiff], . . . had no authority to make employment decisions on behalf of AARP, . . . [and that the plaintiff] makes no allegation that Ms. Newport or Calade had the right to terminate her employment with AARP."  Defs.' Mem. at 6.  Nonetheless, for Count II, rather than distance themselves from AARP, the defendants seek to shield themselves by alleging they are so "affiliated" with AARP that they may not be held liable as a third party.

[13]     At least one state court in another jurisdiction declined to afford a management consultant and his company any protection from a tortious interference claim.  In *Halverson v. Murzynski*, 226 Ga. App. 276 (1997), the plaintiff's employer hired a management consultant affiliated with the Church of Scientology to "evaluate the efficiency and performance" of the company's "personnel and make suggestions which might improve the performance level of the company."  *Id.*  Ultimately, the consultant authored a report that argued in favor of terminating the employee.  *Id.* at 277.  Under Georgia law, the elements of a claim for tortious interference with employment include (1) "the existence of an employment relationship," (2) "interference by one who is a stranger to the relationship," and (3) "resulting damage to the employment damage to the employment relationship." *Id.*  "In addition, it must be shown that the alleged intermeddler acted maliciously and without privilege."  *Id.* (citation omitted).  The consultant contended that he and his company were entitled to summary judgment because they were hired to serve as a management consultant "to advise on the general operation of her business and evaluate the efficiency and performance of her personnel, that actions taken by him were within the scope of his authority, and that [the plaintiff] was discharged because of her abusive behavior."  *Id.*  The court determined that the record did not preclude a finding that the management consultant induced the owner to discharge the plaintiff "not as a result of his evaluation of her job efficiency or performance, but rather because of her hostility toward the Church of Scientology and his concern with [the company's] continuing monetary payments to church-related organizations." *Id.*  The court determined that the owner's "engagement of [the consultant] as a management consultant did not confer upon him a privilege to induce [the owner] to terminate an at-will employee for such reasons."  *Id.*

**IV.     CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss for failure to state a claim upon which relief may be granted is GRANTED in part and DENIED in part.  The motion is GRANTED with respect to Count I as the plaintiff has not plausibly alleged facts giving rise to an inference of discrimination.  The motion is DENIED with respect to Count II because D.C. law does not prohibit claims of tortious interference with at-will employment against a third party.

Date:  May 12, 2017

_____

BERYL A. HOWELL
Chief Judge