# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AUDREY EASAW,

        Plaintiff,

        v.

DEBBIE NEWPORT, *et al.*,

        Defendants.

Civil Action No. 17-28 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

After the plaintiff, Audrey Easaw, was terminated from her position at the American Association of Retired Persons ("AARP"), she sued her former employer's consultants, the defendants Debbie Newport and Calade Partners (collectively, the "defendants"), claiming, *inter alia*, tortious interference with employment. Compl. ¶¶ 4, 33–36, ECF No. 1-1.[1] The plaintiff alleges that when AARP retained Ms. Newport's company, Calade Partners, in 2015 to provide consulting services, Ms. Newport began interfering with the plaintiff's employment by making negative comments about the plaintiff to her supervisors, excluding the plaintiff from AARP meetings, rewriting the plaintiff's job description, and advocating for changes in the plaintiff's position, which interference caused the plaintiff's termination. Pl.'s Am. Mem. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 15–16, ECF No. 39. The defendants have now filed a Motion for Summary Judgment, ECF No. 32, on the remaining tortious interference claim, pursuant to

---

[1] The plaintiff's Complaint included a second claim under the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.*, Compl. ¶¶ 28–32, which claim has been dismissed, *see Easaw v. Newport*, 253 F. Supp. 3d 22, 32 (D.D.C. 2017).

Federal Rule of Civil Procedure 56(a). For the reasons explained below, the defendants' motion is granted.[2]

## I. BACKGROUND

The factual background for the plaintiff's allegations has been previously summarized based on the Complaint, *see Easaw*, 253 F. Supp. 3d at 24–25, but is supplemented here following almost nine months of discovery. The plaintiff began working for AARP in 2011 as a Corporate Engagement Management Director. Pl.'s Opp'n, Ex. A, Decl. of Audrey Easaw ("Pl.'s Decl.") ¶¶ 3–4, ECF No. 36-2.[3] The plaintiff's troubles appear to have started in the fall of 2015, as AARP began shifting the plaintiff's responsibilities from her initial Corporate Engagement Management Director position to a different role in a new department called AARP Experience ("AARPx"). The facts associated with the plaintiff's transitioning role and AARP's eventual decision to terminate the plaintiff's employment are detailed below.

### A. The Plaintiff's Initial Role as Corporate Engagement Management Director

In the fall of 2015, AARP began reducing the plaintiff's responsibilities as Corporate Engagement Management Director. Pl.'s Opp'n, Ex. B, Pl.'s Resps. Defs.' First Set Interrogs. and Req. Produc. Docs. ("Pl.'s Resps. Interrogs.") at 10, ECF No. 36-3. Ultimately, AARP decided to eliminate the Corporate Engagement Management Director position. Pl.'s Resps. Interrogs. at 10; Defs.' Statement Material Facts ("Defs.' SMF") ¶ 5 (undisputed), ECF No. 32-2; Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), Ex. 1, Ed O'Day Dep. ("O'Day

---

[2]       The plaintiff is a resident of the District of Columbia, defendant Ms. Newport is a resident of the state of Tennessee, and defendant Calade Partners is a limited liability company organized under the laws of Tennessee with its principal place of business in Tennessee, Defs.' Notice of Removal ¶ 5, ECF No. 1, and the amount in controversy is $5,000,000, *id.* ¶ 2, giving this Court diversity jurisdiction under 28 U.S.C. § 1332.
[3]       The parties have submitted numerous exhibits in support of and in opposition to the pending motion, each of which has been reviewed, even if not referenced herein. Since some exhibits contain compilations of documents, the parties' filings are, for ease of review, cited with reference to the ECF page number, rather than the page number of the individual documents.

Dep.") at 24, ECF No. 32-3.  The defendants were not involved in the decision to eliminate the Corporate Engagement Management Director role.  Pl.'s Resps. Interrogs. at 10; Defs.' SMF ¶ 5 (undisputed); O'Day Dep. at 24.

### B.    The Plaintiff's Work in the AARPx Department

In August 2015, around the same time that AARP began reducing the plaintiff's role as Corporate Engagement Management Director, AARP began creating a new department called AARPx.  Pl.'s Resps. Interrogs. at 8–10.  AARP retained Ms. Newport and her company, Calade Partners, to provide consulting services for the creation of AARPx.  Defs.' SMF ¶ 6; Defs.' Mem. at 1, ECF No. 32-1.  The plaintiff also started to work on AARPx, and she spent most of her time as the acting "AARP Experience Management Director" due to AARP's "organizational need."  Pl.'s Resps. Interrogs. at 9–10.

The plaintiff worked with Ms. Newport to help "stand up" AARPx, and shortly after that, in the plaintiff's view, Ms. Newport developed a habit of speaking to the plaintiff in an abrasive and disrespectful tone.  Pl.'s Decl. ¶¶ 6–7.  In October 2015, the plaintiff spoke to Ms. Newport about her tone, explained her approach to leading and managing assignments, and said that Ms. Newport should speak to her in a respectful manner.  *Id.* ¶ 7.  Ms. Newport responded, "I get it." *Id.*  The plaintiff also raised her concerns about Ms. Newport's approach to Ed O'Day, the then-interim SVP for AARPx.  *Id.*

After the plaintiff's conversation with Ms. Newport about her tone, the plaintiff felt that Ms. Newport expressed an abrupt "coolness" toward her.  *Id.*  Ms. Newport provided feedback about the plaintiff's work to the plaintiff's supervisors, including negative comments.  For instance, Ms. Newport told Michelle Musgrove, who supervised some of the plaintiff's work on AARPx, that "apparently deliverable date commitments aren't something [plaintiff] thinks are a

priority." Pl.'s Opp'n, Ex. D, Email from Def. to Michelle Musgrove, Nov. 3, 2015, at 2, ECF No. 36-5; Defs.' Mem., Ex. 3, Jim Pendergast Dep. ("Pendergast Dep.") at 7, ECF No. 32-5. Ms. Newport also privately emailed another AARP employee, David Wickenden, whose position is unclear, criticizing "brand promise" language circulated by the plaintiff. Pl.'s Opp'n, Ex. F, Email from Def. to David Wickenden, Jan. 12, 2016, at 19–20, ECF No. 36-7. At the same time, Ms. Newport provided positive comments about the plaintiff's work, including, for example, telling Ms. Musgrove about a slide created by the plaintiff: "I like the start of this slide . . . thoughts?" Pl.'s Opp'n, Ex. F, Email from Def. to Michelle Musgrove, Nov. 16, 2015 ("Nov. 16, 2015 Email"), at 23, ECF No. 36-7.

### C.     The Plaintiff's Attempt to Obtain a Permanent Position in AARPx

From January through March 2016, the plaintiff noticed delayed or no responses to her emails or requests to Ms. Newport and Ms. Musgrove, as well as her exclusion from AARPx meetings. Pl.'s Decl. ¶ 10. In mid-March 2016, Mr. O'Day told the plaintiff that AARP was rewriting the job description for AARPx Management Director. *Id.* ¶ 11. The plaintiff then learned that she could obtain a permanent position in AARPx in two ways: (1) she could either be "slotted" in, or retain, her then-current position; or (2) she could apply for a position if AARP did not "slot" her. Pl.'s Decl. ¶ 11; O'Day Dep. at 15, 17–18; Pendergast Dep. at 22. Eligibility for the first option allowing the plaintiff to retain her position was contingent on AARP determining that she was already completing 70% of the work in the finalized AARPx Management Director job description. Pl.'s Decl. ¶ 11; Pl.'s Resps. Interrogs. at 3–4; O'Day Dep. at 15, 17–18.

AARP Human Resources determined, after the job description was finalized by AARP, that the plaintiff was not performing 70% of the duties. O'Day Dep. at 17–18. Therefore, AARP did not retain the plaintiff in the AARPx Management Director role. *Id.*

At the suggestion of Mr. O'Day, the plaintiff spoke to Jim Pendergast, the incoming SVP of AARPx. Pl.'s Decl. ¶¶ 9, 12–13. Mr. Pendergast informed the plaintiff that she could apply for jobs in AARPx once posted, and that she would be considered through that process. Pendergast Dep. at 8–9, 22. The plaintiff never applied for any posted AARPx position, however. Defs.' Mem., Ex. 2, Pl.'s Dep. ("Pl. Dep.") at 13, ECF No. 32-4.

Ms. Newport worked with Mr. Pendergast on staffing for AARPx, *see* Pl.'s Resps. Interrogs. at 3–6; Pl.'s Opp'n, Ex. D, Email from Jim Pendergast, May 6, 2016 ("May 6, 2016 Email"), at 5–6, ECF No. 36-5; Pl.'s Opp'n, Ex. F, Email from Def. to James Pendergast, May 25, 2016 ("May 25, 2016 Email"), at 2, ECF No. 36-7, but Ms. Newport testified under oath that she neither discussed with anyone at AARP the elimination of the plaintiff's job, nor recommended termination of the plaintiff, Defs.' Mem., Ex. 4, Debbie Newport Dep. ("Newport Dep.") at 3–4, ECF No. 32-6. Ms. Newport's testimony on these latter points is corroborated by Mr. Pendergast, who was involved in staffing AARPx, Pendergast Dep. at 10–12, and the plaintiff testified at her deposition that no one from AARP told her that Ms. Newport advised that she should be fired, Pl. Dep. at 13.

On May 16, 2016, Mr. O'Day told the plaintiff that she would be displaced from employment with AARP, effective July 8, 2016. Pl.'s Decl. ¶ 15. At the plaintiff's request, AARP extended her termination date until August 1, 2016, so that the plaintiff could reach her vesting period. *Id.* ¶ 15; O'Day Dep. at 25.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 directs that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment may appropriately be granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The movant bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in her favor, *see Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016), *cert. denied*, 138 S. Ct. 88 (2017) ("[S]heer hearsay . . . counts for nothing on summary judgment." (alterations in original) (quoting *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007))).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (alteration in original)

(quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations

or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation

marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir.

2015).

For a factual dispute to be "genuine," the nonmoving party must establish more than

"[t]he mere existence of a scintilla of evidence in support of [her] position," *Liberty Lobby*, 477

U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights

Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks

omitted); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *accord* FED. R. CIV. P. 56(e). If

"opposing parties tell two different stories, one of which is blatantly contradicted by the record,

so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir.

2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to

consider the materials explicitly cited by the parties, but may on its own accord consider "other

materials in the record." FED. R. CIV. P. 56(c)(3).

## III. DISCUSSION

Under D.C. law, a *prima facie* case of tortious interference with a contract or business

relationship requires "(1) existence of a valid contractual or other business relationship; (2) [the

defendant's] knowledge of the relationship; (3) intentional interference with that relationship by

[the defendant]; and (4) resulting damages." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196,

202 (D.C. 2017) (alterations in original) (quoting *Newmyer v. Sidwell Friends Sch.*, 128 A.3d

1023, 1038 (D.C. 2015) and *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–

46 (D.C. 2015)). The plaintiff "bears the burden to establish a 'substantial and direct causal link'

between [the defendant's] alleged interference and the damages suffered." *Newmyer*, 128 A.3d

at 1039 (quoting *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47, 51 (D.C. 1991)).

Here, the defendants are entitled to summary judgment because the plaintiff has "fail[ed] to

make a showing sufficient to establish the existence of [elements] essential to [her] case."

*Celotex*, 477 U.S. at 322.

The plaintiff alleges that Ms. Newport interfered with her employment at AARP, causing

her to lose her job, in three ways. First, Ms. Newport "attempted to undermine her by making

derogatory comments" to "poison" the plaintiff's supervisors against her and by "excluding her

from meetings." Pl.'s Opp'n at 15. Second, Ms. Newport directed AARP to rewrite a job

description so that the plaintiff would not be slotted or retained in the role of AARPx

Management Director. *Id.* at 7–8, 15–16. Third, Ms. Newport "tried to manipulate" AARP's

"reorganization to remove" the plaintiff. *Id.* at 15–16. These allegations have scant support in

the record, other than the plaintiff's conclusory statements, but even if every inference is made in

the plaintiff's favor regarding the validity of these allegations, as discussed below, they fall far

short, based on the record evidence, to show a triable issue regarding the required elements for

the plaintiff's tortious interference claim.

### A. Negative Comments to Supervisors and Exclusion from Meetings

As support for her claim that the defendants tortiously interfered with the plaintiff's

employment, the plaintiff points to less than a handful of brief comments made in emails by Ms.

Newport about the plaintiff as evidence of "poison[ing]" the plaintiff's relationship with her

superiors. *See* Pl.'s Opp'n at 4, 6, 15. Yet, none of these comments, such as a reference to the plaintiff's lack of timeliness with work product or a negative critique of the plaintiff's proposed language in work product, rise to the level of intentional interference. *See Soliman v. George Washington Univ.*, 658 F. Supp. 2d 98, 104 (D.D.C. 2009) (ruling that under D.C. law, a plaintiff failed to state a claim for tortious interference, even though the defendants' agents commented that she was "incompetent" and "constantly question[ed] her judgment in front of [the plaintiff's] colleagues," because the "comments may have been unwarranted in her own view, . . . but [the plaintiff] no more than speculate[d] that these comments were made with the specific intent to interfere with her employment"); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) (concluding that a plaintiff failed to establish the "strong showing of intent" required for tortious interference under D.C. law because the plaintiff's evidence had established "at most" "the legitimate disclosure of truthful information in the ordinary course of business," so "[n]othing in the evidence support[ed] more than the rankest speculation" that the defendant "harbored any ill motive or intent").

The plaintiff argues that "questions of intent are for the jury." Pl.'s Opp'n at 15 (citing, *inter alia*, *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563 (D.C. 2000)). Yet the authority on which the plaintiff relies forecloses that argument. *Hollins*, a race discrimination case, explained under the analogous D.C. rule for summary judgment that "[c]ourts are justifiably hesitant to throw out . . . claims on summary judgment" involving "issues concerning the employer's (or supervisor's) motive or intent," but concluded summary judgment was warranted because the evidence "affirmatively showed that there was no disparate treatment," and the plaintiff "failed to present any other evidence of discrimination." *Hollins*, 760 A.2d at 570–71. Here, Ms. Newport's comments merely show the defendants fulfilling their consulting responsibility of

providing constructive questions and commentary to move forward the project for which they were hired on a timely basis, and the plaintiff has failed to present other evidence of Ms. Newport's intent to interfere with her employment at AARP. Rather, Ms. Newport also made complimentary comments about the plaintiff's work. *See, e.g.*, Nov. 16, 2015 Email.

As to the plaintiff's alleged exclusion from meetings, the record is bare as to the defendants' role in convening meetings without the plaintiff or determining who would attend meetings. For example, the plaintiff claims Ms. Newport "scheduled biweekly meetings," Pl.'s Opp'n at 6, but the plaintiff's supporting evidence, Pl.'s Opp'n, Ex. F, Email from Def. to AARP Employees, Feb. 4, 2016 ("Feb. 4, 2016 Email), at 17, ECF No. 36-7, does not indicate that Ms. Newport scheduled meetings or that she excluded the plaintiff. Instead, Ms. Newport emailed a summary of a meeting, which the plaintiff received, memorializing that going forward, meetings would occur biweekly, with the next meeting on February 17, 2016. *See* Feb. 4, 2016 Email. Similarly, the plaintiff claims that she "was excluded from an April 11, 2016 meeting," *see* Pl.'s Opp'n at 8, but there is no evidence in the record corroborating that Ms. Newport scheduled that meeting or excluded the plaintiff from it.

Rather than attribute any exclusion to the defendants, the meetings cited by the plaintiff appear to have been attended by her superiors and, thus, those superiors are more likely to have carried any responsibility for the timing and composition of the attendees. *See, e.g.*, Pl.'s Opp'n, Ex. I, AARPx Meeting Notes, Apr. 11, 2016, at 2–4, ECF No. 36-10 (suggesting that Michelle Musgrove postponed a "Steering Committee Meeting" and referring to a "Benefit Experience Review" meeting to be requested by "Jim [Pendergast]"). Indeed, Ms. Newport testified that she "was not responsible for setting any meetings," so she "couldn't exclude anybody from a meeting." Newport Dep. at 2.

In addition, the plaintiff has identified no evidence suggesting that Ms. Newport's comments, either positive or negative, to the plaintiff's supervisors or the plaintiff's exclusion from meetings, caused or even factored into AARP's decision to terminate the plaintiff's employment. Given this record, a reasonable jury would not be able to conclude that Ms. Newport's comments or actions caused the plaintiff to lose her job at AARP. *See Little v. D.C. Water & Sewer Auth.*, 91 A.3d 1020, 1030 (D.C. 2014) (affirming summary judgment on a tortious interference claim, reasoning that despite evidence of statements by some of the defendant's employees that they wanted to get the plaintiff "off the job," "missing from the record [was] any evidence that . . . [these statements] caused [the plaintiff's] . . . termination").

### B.     Rewriting of Job Description

The plaintiff asserts that she reviewed a draft job description for her acting position in AARPx and concluded herself that she was performing 70% of the duties described, which conclusion would have made her eligible to retain the position. *See* Pl.'s Opp'n at 16. Nevertheless, under the subsequent, finalized job description, which AARP Human Resources used to make the slotting determination, the plaintiff was not performing 70% of the duties, making her ineligible to be slotted into the position. *See* O'Day Dep. at 17–18 (testifying that Human resources "looked at what [the plaintiff] was currently doing and made the assessment that she was not doing 70 percent of what this job entailed and that's why she wasn't slotted").[4] According to the plaintiff, she "was the only full-time employee within AARPx whose position

---

[4]     The plaintiff argues that Mr. O'Day's deposition testimony about what AARP Human Resources told him is inadmissible hearsay and may not be relied upon. Pl.'s Resp. SMF ¶ 13. Although "sheer hearsay . . . counts for nothing" on summary judgment, summary judgment evidence need not be "in a *form* that would be admissible at trial," so long as it is "capable of being converted into admissible evidence," *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis in original), and therefore this testimony may be properly considered here. Even if Mr. O'Day's deposition testimony about AARP's Human Resources slotting determination were excluded, however, the plaintiff still has raised no genuine dispute over the fact that Ms. Newport was not involved in AARP's slotting determination.

description was rewritten," Pl.'s Opp'n at 16 (citing Pl.'s Decl. ¶ 11), and she blames the revision of the job description and her ineligibility to retain her position on the defendants.

To be clear at the outset, the plaintiff does not dispute that she was not performing 70% of the duties in the finalized job description, *see* Pl.'s Statement Disputed Material Facts Opp'n Defs.' Mot. Summ. J. ("Pl.'s Resp. SMF") ¶¶ 12–13, ECF No. 36-11, and thus concedes that she could not be slotted into the AARPx position. The gravamen of her complaint against the defendants is that "Ms. Newport requested and approved the rewriting of [the plaintiff's] job description." Pl.'s Decl. ¶ 11. Yet, this assertion has absolutely no record support. To the contrary, the plaintiff's own declaration states that Mr. O'Day told her that "*AARP* was re-writing the job description." *Id.* (emphasis added). Moreover, other witnesses provided sworn testimony that Ms. Newport was not involved in drafting the job description used for AARP's slotting determination. *See* O'Day Dep. at 18–19; Pendergast Dep. at 14; Newport Dep. at 2–3.

On this record, the plaintiff's declaration is insufficient to create a genuine dispute of material fact. Where the "plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence," *Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017), no genuine issue of material fact is presented sufficient to defeat summary judgment, *see also Robinson v. Pezzat*, 818 F.3d 1, 10 (D.C. Cir. 2016) (explaining that a plaintiff's testimony that is "contradicted by multiple disinterested witnesses" and "by the plaintiff herself" can be excluded from consideration on summary judgment, because the testimony is "so undermined as to be incredible"). The absence of any genuine dispute over the fact that Ms. Newport had no role in rewriting the plaintiff's job description means that no reasonable jury could conclude that Ms. Newport interfered in AARP's slotting determination.

### C.    Manipulation of Reorganization

The plaintiff does not and cannot claim that she lost her original Corporate Engagement Management Director position due to any action by the defendants, who had no involvement in AARP's decision to eliminate that job. *See* Defs.' SMF ¶ 5 (undisputed); O'Day Dep. at 24. As the defendants correctly explain, the plaintiff's "employment at AARP ended because her position was eliminated, following a company reorganization. That reorganization, and the accompanying decision to eliminate the responsibilities of [the plaintiff's] position, occurred prior to AARP contracting with Calade for consulting services." Defs.' Mem. at 2. Indeed, the plaintiff admits that as part of AARP's decision to "restructure," her role as Corporate Engagement Management Director was reduced as she began working on AARPx. *See* Pl.'s Opp'n at 10. AARP informally, if not formally, eliminated the Corporate Engagement Management Director role by February 2016. *See* Pl.'s Resps. Interrogs. at 10. At that time, the plaintiff spent 99% of her time on AARPx, and AARP gave the plaintiff her "last assignment in the Corporate Engagement Management Director role." *Id.* Accordingly, the plaintiff's position at AARP "was going away" and she "was effectively being displaced." O'Day Dep. at 22.

Against that backdrop, the plaintiff nonetheless attributes her termination to Ms. Newport somehow manipulating AARP's reorganization at her expense. As support, the plaintiff asserts that AARP "assured" her that she "would have at least a director-level role in the new AARPx organization." Pl.'s Opp'n at 14. This assertion is wholly uncorroborated, since every AARP executive deposed on the issue contradicted the plaintiff, testifying that her role in AARPx was temporary and thus not guaranteed. O'Day Dep. at 10–11, 13–14; Pendergast Dep. at 12–13.

The plaintiff also argues that Ms. Newport had authority to make staffing decisions for AARPx, positing that "[i]t was widely known throughout AARP Experience that Ms. Newport was given full authority to make staffing decisions related to 'standing up' the AARP Experience, and both Mr. O'Day and Ms. Musgrove informed [the plaintiff] that Ms. Newport had this authority." Pl.'s Opp'n at 14. As support, the plaintiff declares that Mr. O'Day told her that "Ms. Newport was given complete authority by [AARP Executive Vice President] Martha Boudreau for oversight of standing up the AARP Experience." Pl.'s Decl. ¶ 7; *see also* Pl.'s Resps. Interrogs. at 3–4, 5–6 (stating it was "widely known . . . that Debbie Newport had been working on the new team structure," that "[b]oth Ed O'Day and Michelle Musgrove were very clear that Debbie Newport's role was to advise on the 'standing up' of the new organization, and that Martha Boudreau relied on her recommendations," and that unspecified AARP employees "knew that Ms. Newport had been given full authority by [Martha Boudreau] to lead staffing decisions related to 'standing up' the AARP Experience").

The plaintiff's own declaration and interrogatory responses are insufficient to create a genuine dispute over Ms. Newport's authority to staff AARPx. "The plaintiff must do more than merely assert as 'facts' her beliefs about material issues. Instead, beliefs that are uncorroborated—and, to a large extent, contradicted—by other witnesses or documentary evidence does not amount to competent evidence sufficient to defeat summary judgment, particularly when the factual assertions are susceptible to corroboration after an ample opportunity for discovery." *Smith v. Lynch*, 115 F. Supp. 3d 5, 14 (D.D.C. 2015) (citing *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 7–8 (D.C. Cir. 2015)).

Here, all other evidence on the subject, including evidence put forward by the plaintiff, contradicts the plaintiff's own statements in her declaration and interrogatory responses. Mr. Pendergast and Ms. Newport both testified that Ms. Newport did not have AARPx staffing authority, *see* Pendergast Dep. at 10–11; Newport Dep. at 5. In an email the plaintiff put in the summary judgment record, Ms. Newport asked Mr. Pendergast if the plaintiff should be shown on an AARPx organizational chart as an approved hire, corroborating the fact that Ms. Newport did not wield AARPx staffing authority and instead deferred to Mr. Pendergast. May 25, 2016 Email at 2. This email undercuts any argument that Ms. Newport caused the plaintiff's termination since Ms. Newport sent the email *after* Mr. O'Day told the plaintiff on May 16, 2016 that her employment would be terminated, *see* Pl.'s Opp'n at 9, and the text of the email indicates that Ms. Newport was unaware that AARP had already made the decision to terminate the plaintiff.

Notwithstanding this evidence, the plaintiff contends that Ms. Newport "worked with Pendergast to determine which employees who worked within the AARP Experience would be retained and transferred to the new organization and which employees would be terminated." Pl.'s Resp. SMF ¶ 4. The plaintiff points to a May 6, 2016 email, in which Mr. Pendergast stated, "Michelle [Musgrove], Debbie [Newport] and I met this morning. Just got done with the budget and headcount work. . . . Of the 2 matrices on that spreadsheet, the one with the yellow header is for net new/new hires, the one with the gray header would be for transfers out of their current roles into AARPx." *See* Pl.'s Resp. SMF ¶ 4 (quoting May 6, 2016 Email). While this May 6, 2016 email indicates that Ms. Newport attended a meeting with Mr. Pendergast about AARPx's organizational structure, nothing in the text demonstrates that Ms. Newport, as

opposed to the plaintiff's superiors, had decisionmaking authority for AARP to terminate the plaintiff's employment, and the plaintiff has not put into the record the budget "spreadsheet" that was the subject of the discussion. *See* May 6, 2016 Email. To infer from the email that Ms. Newport did have such authority or caused the plaintiff's termination would require an unsupportable inference amounting to inappropriate speculation. *See Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016) (concluding that a plaintiff's argument was "too speculative to defeat summary judgment").

The plaintiff's declaration includes a vague and conclusory assertion "[u]pon information and belief" that "Mr. Pendergast spoke to Defendant Newport . . . and as a result, a decision was made that I would not continue employment with AARP." Pl.'s Decl. ¶ 13. Such a bald assertion, without any supporting evidence after discovery from the persons involved, is not enough to create a genuine dispute of material fact. "While no doubt earnestly held, the plaintiffs' subjective impressions and beliefs regarding their experiences while employed . . . generally are insufficient to raise a genuine factual dispute requiring resolution at trial." *Burton v. D.C.*, 153 F. Supp. 3d 13, 24 (D.D.C. 2015), *aff'd sub nom. Nelson v. D.C.*, 689 F. App'x 642 (D.C. Cir. 2017). Indeed, Ms. Newport did not discuss with anyone at AARP the elimination of the plaintiff's job, and she did not recommend terminating the plaintiff from her employment at AARP. Newport Dep. at 3–4. The plaintiff admitted at her deposition that no one from AARP told her that Ms. Newport advised that she should be fired. Pl. Dep. at 13.

In sum, because the plaintiff has not shown that Ms. Newport interfered with AARP's reorganization so that the plaintiff would be terminated, her claim must be rejected. *See Little*, 91 A.3d at 1030 (reasoning that there was not sufficient evidence of interference where the

plaintiff "testified at his deposition that he did not know whether anyone from [the defendant] asked that he be removed from his job").

On a final note, when the plaintiff did not obtain an AARPx position through the slotting process, she had the opportunity to apply for an AARPx job. O'Day Dep. at 15, 17–18; Pendergast Dep. at 22. The plaintiff admitted in her deposition that she never applied for such positions, Pl. Dep. at 13, but asserts without any support that similar to "all of the other AARP employees and contractors who were transferred to positions in the AARP Experience," she only expressed interest in the position she was performing, Pl.'s Resp. SMF ¶¶ 14–15. The plaintiff does not even try to attribute her decision not to apply for another position to any of Ms. Newport's actions. Since the plaintiff did not apply, AARP never decided whether the plaintiff could or would be employed by AARP in another capacity. Pendergast Dep. at 12–13.

The plaintiff relies on an undated organizational chart and Mr. Pendergast's deposition to argue that she "was the only person in the AARP Experience team who was not retained." Pl.'s Opp'n at 8 (citing Ex. H, Undated Organizational Chart (sealed) ("Undated Org. Chart") at 3, ECF No. 38 and Ex. G, Pendergast Dep. ("Ex. G") at 4–6, ECF No. 36-8). The undated organizational chart provided by the plaintiff reflects many positions as open, with the notations "To Be Hired" through "Internal Transfer or New Hire," under Ms. Musgrove's "AARPx Strategy" team and other AARPx groups, Undated Org. Chart at 3, thus indicating that open positions were available within AARPx, for which positions the plaintiff could have been considered, had she applied. Mr. Pendergast testified that he "had drawn the organization" and hired into some open positions individuals who "went through the recruiting/job posting/interview process." Ex. G at 4–5. Consequently, even if the plaintiff is correct that she was the only AARPx team member not retained, the chart she presents, combined with Mr.

Pendergast's testimony, suggests that the plaintiff's failure to apply for an open position contributed to her not being retained, rather than any tortious interference by the defendants.

## IV.      CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment is GRANTED. An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: October 15, 2018

_____
BERYL A. HOWELL
Chief Judge